McROBERTS et al., Appellees,

v.

DAYTON POWER & LIGHT COMPANY, Appellant.

[Cite as *McRoberts v. Dayton Power & Light Co.* (2001), 143 Ohio App.3d 304.]

Court of Appeals of Ohio,
Second District, Darke County.

No. 1527.

Decided Feb. 9, 2001.

*John E. McRoberts,* appellee, *pro se.*

*Brian D. Huelsman* and *James D. Utrecht,* for appellee Westfield Companies.

*Scott R. Thomas, Norman J. Frankowski II* and *Jeanette N. Dannenfelser,* for appellant Dayton Power & Light Company.

BROGAN, Judge.

On June 20, 1998, John McRoberts and his wife, Gloria, were in the kitchen of their home, preparing food for a family gathering. Suddenly, the lights went crazy and got bright and dim. Some bulbs blew. Fans in the house also began to turn as if they were on high. McRoberts immediately ran outside and pulled the main disconnect switch to stop the flow of electricity to the house. However, McRoberts did not call Dayton Power and Light Company ("DP&L"), which furnished electrical service to the premises. Instead, he called an acquaintance, Dick O'Brien, who was an electrician. About an hour later, O'Brien arrived at the McRobertses' home. O'Brien and McRoberts then spent about thirteen hours over the course of two days investigating the electrical problem.

The two men began by checking voltages. In order to do this, they re-energized the electrical system and turned on individual circuits, one at a time. The breakers were kept open long enough to test voltages, or about ten to fifteen seconds. After each circuit was tested, it was turned off. As the circuits in the house were checked, O'Brien could see that some lights in the house were bright and others were dim. This indicated to him that some circuits had too much

voltage. The voltage readings on the circuits also showed "wild voltage." Specifically, the correct readings should have been from 120 to 125 volts. Instead, the readings ranged from 80 to 180 volts.

After working most of the evening, the two men stopped because it was late and there were no lights. O'Brien then came back around 8:00 a.m. the next day. After doing more checking, O'Brien called his partner, Orin Queen, who was an electrical engineer. Queen told O'Brien that there was an open neutral somewhere. Neutrals, or bare conductors, are found on every circuit. The purpose of a neutral is to act as a messenger for the insulated, or hot conductors. Because the combination of the two types of conductors balances out the voltage to the correct amount (in this case, 120 volts), voltage will go up and down if a neutral is open, *i.e.*, if it is not functioning.

After O'Brien talked to Queen, he and McRoberts opened and visually inspected the junction boxes on the inside of the house. The connections seemed to be tight and everything was in good shape. After talking to Queen again, O'Brien and McRoberts called DP&L around noon to report a problem in DP&L's service line. About one hour later, a DP&L repairman arrived at the house. Either at that time or at the time of the call to DP&L, McRoberts noticed a black spot on the ground, about 5 to 10 feet from the house. Immediately above this spot, about 12 feet in the air, was a splice on the service line. The splice was in the leaves (of a tree), but McRoberts could still see it.

When the repairman arrived, he began searching the service line. As soon as he saw the splice, he said, "Your problem is probably right there." The repairman then spliced a new piece of wire back to the existing service drop, and left the old splice with McRoberts. After the repair was made, McRoberts and O'Brien turned on the main disconnect and again checked voltages. At that time, everything was fine, and the voltage did not fluctuate. O'Brien left the circuits on and then checked to see whether the appliances were running. However, numerous appliances were not working, including the air conditioner, many lights, the oven, dryer, washer, microwave, television, and refrigerators. On the other hand, the fans, a freezer, and some lights did work.

On June 22, 1998, McRoberts notified his insurer, Westfield Insurance, about the incident. Westfield's claims adjuster, Thomas Kondas, did not visit the McRobertses' home, nor did he inspect the appliances. Instead, Kondas told McRoberts to have the appliances evaluated and repaired, if possible. Kondas further indicated that Westfield would pay replacement costs if the items were beyond repair. Ultimately, Westfield paid the McRobertses approximately $4,142.61, which included charges for appliance repair, some new appliances, and miscellaneous items like replacement of groceries. Unfortunately, neither Westfield nor McRoberts retained the damaged appliance parts and appliances.

On April 21, 1999, McRoberts filed suit against DP&L in the Small Claims Division of the Darke County Court. At DP&L's request, the case was transferred to the regular docket of the county court. Westfield then filed a subrogation action against DP&L in the Darke County Court on August 11, 1999, alleging that DP&L had negligently maintained the neutral wire running to the McRobertses' property. After the two cases were consolidated, DP&L filed a motion for sanctions and for summary judgment. In the motion, DP&L claimed that the plaintiffs' failure to preserve the appliances prevented DP&L from determining the cause of the damage. Accordingly, DP&L asked the court to preclude plaintiffs from presenting any expert testimony on the cause of the damage to the appliances. Under the assumption that the motion for sanctions would be granted, DP&L further argued that plaintiffs could not prove their case because they would be unable to establish causation.

On April 4, 2000, the trial court granted the motion for sanctions and suppressed all of plaintiffs' expert testimony that was based on actual inspection of the appliances. However, the court overruled the summary judgment motion on the theory that plaintiffs might still present competent expert testimony on causation based on something besides physical inspection. In addition, the court left open the possibility of applying *res ipsa loquitur.*

A bench trial was held on June 29, 2000. At that time, the plaintiffs presented testimony that DP&L had negligently installed the splice by failing to properly separate the neutral and hot conductors. According to plaintiffs, the resulting connection between the wires caused the neutral to open and allowed conduction of abnormal voltage. In contrast, DP&L presented evidence that the splice was correctly installed and that other normal wear and tear from ice, wind, trees, and so on caused the connection between the wires. After hearing the evidence, the trial court found that DP&L had negligently installed the splice.

Due to the court's earlier ruling on the motions for sanctions, no expert testimony was presented about the cause of damage to the appliances. As we mentioned above, McRoberts did testify that various appliances worked before the incident but did not work when power was finally restored. Further, O'Brien testified generally that fluctuating voltages can damage appliances. However, O'Brien also said that he was not an expert on appliances.

In its decision, the trial court applied *res ipsa loquitur* to overcome the lack of direct evidence on causation. Accordingly, the trial court found DP&L liable for the damages. Due to some problems with documentation, the court awarded Westfield only $3,565.74 of its claimed damages. Additionally, the court awarded McRoberts $1,531.71. This amount included a $250 deductible, some costs for groceries that had not been reimbursed by Westfield, and $1,000 for labor (at $10

per hour) that McRoberts expended in arranging for repair of the household appliances.

DP&L timely appealed, raising the following assignments of error:

"I. The trial court erred as a matter of law in using *res ipsa loquitur* to supply the element of causation.

"II. The trial court erred as a matter of law when it awarded damages to appellees despite spoliation.

"III. The trial court erred as a matter of law when it awarded damages to appellees despite the fact that damages for McRoberts's 'labor' has [*sic*] no basis in law.

"IV. The trial court erred as a matter of law when it held DP&L to a duty of care that is supported neither by the evidence nor the law.

"V. The trial court erred as a matter of law when it held DP&L to a duty of method of installation that is not supported by the law or the evidence.

"VI. The trial court erred as a matter of law when it found no superseding negligence."

After reviewing the record, we find that the first and sixth assignments of error have merit. Accordingly, the judgment of the trial court will be reversed. Because these assignments of error resolve the case, the remaining four assignments of error are moot and will not be addressed.

I

In the first assignment of error, DP&L contends that the trial court erred in applying *res ipsa loquitur* to supply the necessary element of causation. DP&L's argument in this regard is twofold. First, DP&L says that it was not the only party exercising control over the electric current. Second, DP&L alleges that the damage would have occurred even if DP&L had exercised ordinary care. The sixth assignment of error is based on DP&L's claim that McRoberts's and O'Brien's negligent troubleshooting actions over a period of two days superseded any actions of DP&L.

■ To establish negligence, a plaintiff must show "that the defendant had a duty, recognized by law, requiring him to conform his conduct to a certain standard for the protection of the plaintiff, that the defendant failed to conform his conduct to that standard, and that the defendant's conduct proximately caused the plaintiff to sustain actual loss or damage." *Phillips v. Dayton Power & Light Co.* (1994), 93 Ohio App.3d 111, 116, 637 N.E.2d 963, 966.

In the present case, the trial court found direct evidence that DP&L failed to conform its conduct to the appropriate standard of care. We agree that the record contains evidence supporting such a finding. Specifically, Orin Queen, who was both a DP&L employee for forty-two years and an electrical engineer, testified that the splice was improperly made. According to Queen, the improper splice allowed the neutral wire to contact the hot wires and caused a short circuit. Conflicting testimony also existed, as DP&L's own expert testified that the splice was properly made. However, based on Queen's testimony, the trial court could properly find that DP&L departed from the appropriate standard of care.

By the same token, plaintiffs also had to prove that DP&L's actions proximately caused their damages. The Ohio Supreme Court has defined "proximate cause" as "[t]hat which immediately precedes and produces the effect, as distinguished from a remote, mediate, or predisposing cause; that from which the fact might be expected to follow without the concurrence of any unusual circumstance; that without which the accident would not have happened, and from which the injury or a like injury might have been anticipated." *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 143, 539 N.E.2d 614, 617.

Due to the lack of expert testimony on damages, the trial court was not able to find direct evidence of causation. In particular, the trial court stressed the lack of direct testimony from a duly qualified expert that the abnormal flow of voltage caused the specific damage to each appliance. Instead of relying on direct expert evidence, the trial court used *res ipsa loquitur* to supply the missing element. By using this evidentiary doctrine, a fact-finder may infer causation based on the circumstances surrounding an injury. However, for the doctrine to apply properly, the plaintiff must provide evidence showing "(1) [t]hat the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed." *Hake v. George Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 66–67, 52 O.O.2d 366, 367, 262 N.E.2d 703, 705.

The circumstances relied on by the trial court included the fact that the splice caused the abnormal current and was in DP&L's exclusive control at the time. The court also focused on the fact that McRoberts's appliances were in good working order before the short and were not in good working order thereafter.

As we noted earlier, an initial incident occurred when Mr. and Mrs. McRoberts were in the kitchen. At that time, DP&L admittedly had exclusive control over the electric current. However, there is a lack of evidence indicating that the injury occurred at this time. Specifically, no one checked the appliances to see if

they were working. Instead, McRoberts simply turned off the electric current. McRoberts and O'Brien then turned the current back on to test voltages. The testing then went on for several hours over the course of two days, although the current was not on for a prolonged period at any one time. Notably, however, the voltage was also not on for a prolonged period at the time of the initial incident, *i.e.*, McRoberts testified that he immediately ran outside and turned off the current. Moreover, during the voltage testing, O'Brien saw lights going "bright and dim," like they had at the time of the initial incident. Based on these facts, DP&L did not have exclusive control over the instrumentality (the current) that allegedly caused the injury.

 Because the first part of the test was not satisfied, the trial court improperly used *res ipsa loquitur* to satisfy the missing element of causation. Accordingly, we do not have to consider whether the injury would have occurred if ordinary care was exercised. We do note that the record contains evidence indicating that the incident could have occurred even with the exercise of ordinary care. As we mentioned earlier, DP&L's expert testified that the splice was properly made. This expert also said that the connection between the neutral and hot wires could have been caused by ordinary wear and tear on the line due to the effect of wind, ice, trees, and time. Consequently, the incident is not one that necessarily resulted from a lack of ordinary care by DP&L. However, we do not rely on that fact.

 In light of the above analysis, we agree that the trial court erred in applying *res ipsa loquitur* to supply the missing element of causation. This was not harmless error, since, as we said, the evidence does not reveal when the damage to the appliances occurred. In this context, we note that the trial court commented as follows in its decision:

"The claimed intervening act by Plaintiff, McRoberts and O'Brien was not of sufficient length to, by any degree of certainty, have reasonable [*sic*] cause [*sic*] the injury. In the context of the flow of abnormal voltage from the time of short to time of repair, 10 to 15 seconds of additional flow is insignificant."

We have carefully reviewed the trial transcript, and we find no evidence to support these conclusions. Specifically, no witness indicated that a flow of abnormal voltage of 10 to 15 seconds is insignificant. In fact, as we said earlier, to the extent that any testimony exists, it indicates that the same effect occurred during the first incident and during the voltage testing, *i.e.*, the lights went "bright and dim" on both occasions.

Further, as we said earlier, neither McRoberts nor O'Brien testified that the appliances were checked after the initial incident to see if they worked. This was not a factual subject precluded by the ruling on the motion for sanctions.

Specifically, McRoberts was allowed to testify at trial that the appliances worked before the first incident and did not work when power was ultimately restored. In this regard, we note that if McRoberts had tested the appliances after the initial incident, and had found that they did not work, plaintiffs might have been able to prove the timing of the damage to the appliances. However, because plaintiffs did not present testimony to that effect, or, indeed, any distinguishing testimony, they failed to adequately prove that DP&L's actions resulted in the alleged injuries, or that DP&L had exclusive control over the current when the injuries occurred.

In view of the preceding discussion, the first assignment of error is sustained.

■ As an additional matter, we agree with DP&L's position in the sixth assignment of error concerning the superseding effect of O'Brien's negligent troubleshooting. Thus, assuming that DP&L was negligent and that causation could be established, O'Brien's actions broke any causal connection between DP&L's negligence and the alleged injuries. As the Ohio Supreme Court noted in *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 6 OBR 209, 451 N.E.2d 815:

"Whether an intervening act breaks the causal connection between the negligence and the injury, thus relieving one of liability for his negligence, depends upon whether that intervening actor was a conscious and responsible agency which could or should have eliminated the hazard, and whether the intervening cause was reasonably foreseeable by the one who was guilty of the negligence." *Id.* at 159, 6 OBR at 213, 451 N.E.2d at 819.

■ "[A]n intervening act of a third person which relieves one of liability for his negligence [is referred to] as a 'superseding cause.'" *Id.* at 159, 6 OBR at 213, 451 N.E.2d at 819, fn. 1, citing Restatement of the Law 2d 465, Torts, Section 440.

Under the unique circumstances of this case, we do not believe that DP&L could reasonably have foreseen that an experienced electrician would, upon hearing the symptoms of an open neutral, fail to immediately cut off the service (or leave the service disconnected) and call DP&L. We also do not believe that DP&L could reasonably have foreseen that the same experienced electrician would turn the voltage on and off for several hours over a period of two days, allowing abnormal voltage to flow into the circuits of a house. In this regard, we are perplexed by the fact that O'Brien, an electrician of almost thirty years' experience, did not know the symptoms of an open neutral. O'Brien also said that he did not know that a consistent number of unequal voltages indicates an open neutral.

In contrast, DP&L's expert said that if he were told while troubleshooting that lights went bright and dim, the first thing he would do is cut off the service.

Similarly, Orin Queen, plaintiffs' own expert, admitted that lights going bright and dim indicate an open neutral. Queen also said that if he were troubleshooting and saw a problem where the lights were bright and dim and suspected an open neutral, he would turn off the power right away and keep it off until he could call the public utility. Queen appeared to excuse McRoberts's actions by saying that these symptoms would not mean anything to someone unfamiliar with electricity. We agree that McRoberts was not necessarily negligent in failing to call DP&L, although calling one's electrical provider does seem like a logical thing to do in this kind of situation.

On the other hand, Queen's comment does not excuse O'Brien. Specifically, Queen also said that in the above circumstances, turning off the electricity and calling the utility would be an appropriate thing to do for someone familiar with electricity. In fact, Queen agreed that this would be the thing he would want to do right away. Presumably, electricians fit within the category of persons who are familiar with electricity.

In view of the above facts, and assuming that DP&L was originally negligent, any causal connection between DP&L's negligence and the alleged injuries was broken by O'Brien's superseding negligence. Consequently, the sixth assignment of error also has merit and is sustained.

Based on the above analysis, the first and sixth assignments of error are sustained. Notably, the disposition of these two assignments of error moots the remaining assignments of error.

Accordingly, the judgment of the trial court is reversed.

*Judgment reversed.*

WOLFF, P.J., and FREDERICK N. YOUNG, J., concur.